NOT DESIGNATED FOR PUBLICATION

No. 116,421

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
KANSAS STAR CASINO, L.L.C.
for the Year 2014 in Sumner County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed June 8, 2018. Affirmed in part, reversed in part, and remanded with directions.

*Jarrod C. Kieffer*, *Lynn D. Preheim*, and *Frank W. Basgall*, of Stinson Leonard Street LLP, of Wichita, for appellant/cross-appellee Kansas Star Casino, L.L.C.

*David R. Cooper* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee/cross-appellant Sumner County.

Before POWELL, P.J., MCANANY, J., and HEBERT, S.J.

POWELL, J.:  Kansas Star Casino, L.L.C. (Kansas Star) appeals from the ruling by the Board of Tax Appeals (BOTA) which established a 2014 valuation for ad valorem tax purposes of $97.6 million for its real property located in Sumner County, Kansas. This is the companion case to the 2013 tax year property valuation appeal, *In re Equalization Appeal of Kansas Star Casino*, No. 115,587, issued this same day. (At the time Kansas Star appealed the County's tax valuation, the agency was known as the Court of Tax Appeals. The agency name was changed to the Board of Tax Appeals [BOTA] during the 2014 legislative session. L. 2014, ch. 141. For purposes of consistency, this opinion refers only to BOTA.)

1

On appeal, Kansas Star complains that BOTA erred (1) by classifying all 195.5 acres as commercial property; (2) by rejecting Kansas Star's expert's cost approach appraisal; and (3) by rejecting both its expert's and Sumner County's expert's income approach appraisals for the property and, instead, applying its own income approach by using average input values for its allocation percentage and EBITDA (earnings before interest, tax, depreciation, and amortization) multiplier. The County cross-appeals, arguing that BOTA's decision to reject the County's expert's opinion on functional obsolescence, particularly as it relates to superadequacy, is not supported by the record and is unreasonable, arbitrary, and capricious. The County also argues that BOTA's income allocation approach analysis, which in effect split the difference between both parties' figures by attempting to use a median number, is not supported by the record and is unreasonable, arbitrary, and capricious.

For reasons more fully explained below, we agree with the parties that BOTA improperly adopted its own income allocation approach to valuing the property by utilizing supposed median figures to establish a 21% profit margin, an EBITDA multiplier of 7.64, and a 30% real estate allocation percentage because such alleged median figures are unsupported by the record. The case is remanded to BOTA for reconsideration of the appropriate figures for profit margin, EBITDA multiplier, and real estate allocation. We affirm BOTA in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

As this court explained in detail in *In re Equalization Appeal of Kansas Star Casino*, 52 Kan. App. 2d 50, 52-55, 362 P.3d 1109 (2015), *rev. denied* 307 Kan. ___ (December 20, 2017), Kansas Star is one of four state-sponsored gaming enterprises in Kansas and is located in the south central gaming zone. In April 2007 the Kansas Legislature enacted K.S.A. 74-8733 et seq., the Kansas Expanded Lottery Act (KELA) to authorize a limited number of casinos to be operated in Kansas. KELA divided the state

2

into four gaming zones: northeast, south central, southwest, and southeast, with a single gaming facility allowed in each gaming zone. K.S.A. 2017 Supp. 74-8734(a), (d), and (h)(19). Sedgwick County and Sumner County comprise the south central gaming zone. K.S.A. 2017 Supp. 74-8702(f). Additional background is also included in the companion case 115,587.

A.      *The Subject Property*

The property upon which the casino sits is located on two formerly separate tracts of land, referred to as the Wyant and Gerlach tracts, and is located in the northeast part of Sumner County, nearly adjacent to Sedgwick County and just west of the Kansas Turnpike/Interstate Highway 35. Peninsula Gaming, Kansas Star's former parent company, acquired both tracts in July 2010 for a total purchase price of nearly $17 million and combined them into a single parcel of land. The property's improvements consist of a casino and an arena building which are located entirely on the Gerlach tract. Because the property sits on low ground, Kansas Star set aside a little over 41 acres for drainage.

The 195.5 acres held by Kansas Star is more land than is necessary for the casino itself, and Kansas Star planned to use the undeveloped land for other projects, such as an RV park. However, the plans for future development have not come to fruition. The original plan for an arena and equine event center proved to be unprofitable and unnecessary, so Kansas Star negotiated with the Kansas Lottery to amend its management contract to allow for some funds to be shifted away from arena development and towards conference space.

On December 20, 2013, Kansas Star entered into a lease agreement with Mark Hardison to farm 63.5 acres of the property that had originally been planned for future development, in exchange for mowing the drainage areas and $1 in consideration. After

3

the January 1, 2014 valuation date, Hardison raised soy beans on the property. None of the 63.5 acres was used to operate the casino business. The County classified the entire 195.5-acre parcel as commercial and industrial for tax year 2014.

B.    *The Arena*

The arena building was originally constructed as a temporary casino. From December 26, 2011, through December 21, 2012, Kansas Star operated a temporary casino in its arena while the permanent casino was being constructed. The permanent casino opened in December 2012, after which time Kansas Star began the process of converting the temporary casino back into an arena. The permanent casino is 164,790 square feet for a total building area of 327,412 square feet. The casino floor in the permanent casino is 78,000 square feet, which is more than double the gaming floor space in the temporary casino.

The arena is 162,622 square feet with a maximum seating capacity in concert mode of 6,200. Kansas Star held its first concert at the arena on June 29, 2013. However, in the first 9 months of operation, the arena hosted just 16 events. One major event had to be cancelled because of low ticket sales, forcing Kansas Star to make a $200,000 buyout. Kansas Star found that during the events, gaming revenue went down in the casino due to full parking lots, long lines, and crowds. Kansas Star also found the equine events did not produce the expected revenue, so it minimized the focus of the arena as an equestrian center. Dan Ihm, the vice president general manager of the Kansas Star Casino, testified that the arena had a $500,000 operating loss in 2013. This loss represented the total lost on the individual events that were held but did not include fixed overhead expenses such general advertising, maintenance, and utilities.

Materials submitted by Kansas Star during the bidding process for the gaming license projected that the arena would sustain operating losses ranging from $790,170 in

2013 to $534,046 in 2016. Kansas Star cites evidence in the record disputing this expectation and in support of its expectation that the arena would increase revenue. Despite the expectations, the arena does not operate a profit on its own nor does it generate additional gaming revenue. The arena is competing in a saturated market, and all of the other arenas are closer to Wichita. The completion of the arena reduced the casino's profitability in 2013. Wendy Runde, the former assistant manager of the Kansas Star Casino, testified that Kansas Star would be more profitable if the arena had never been built. Ihm testified that Kansas Star was better off operating out of the temporary arena than operating the permanent casino and arena. Ihm said that he would not have built the arena in order to maximize profits.

Kansas Star collected $192.4 million in total revenue in 2013, which exceeded preopening projections for 2014 by more than 15%. However, the EBITDA decreased. Ihm believed the dip in profits was attributable, at least in part, to the addition of nongaming amenities such as restaurants, which carry overhead expenses and are not big revenue drivers. Kansas Star's financial data showed that operating expenses jumped from approximately $115 million to $157 million. One significant expense increase was an "affiliate management fee" paid by Kansas Star to its parent company, Boyd Gaming, which alone decreased Kansas Star's overall EBITDA.

C.    *The Appraisals*

The County valued the property at $153.5 million based on an appraisal performed by Richard Jortberg, MAI. Kansas Star appealed this value to BOTA, where the County had the evidentiary burden to show the validity and correctness of its valuation of the property. See K.S.A. 2013 Supp. 79-1609. Kansas Star asserted a value of $75 million.

5

1. *The County's appraisal expert*

Jortberg appraised the subject property for tax year 2014. Jortberg has numerous years of experience appraising casinos for the taxing authorities in Colorado. Jortberg considered all three approaches to value: the sales comparison approach, the cost approach, and the income approach.

To calculate land value, Jortberg performed a highest and best use analysis and concluded that it would be physically possible, legally permissible, financially feasible, and maximally productive to use the subject property for gaming/casino purposes, as it was the property's highest and best use, both as vacant and improved. Jortberg decided not to rely on a sales comparison approach because of a lack of comparable sales that would provide a good indication of transaction-based value.

Jortberg relied on five comparable sales to derive land value: (1) the acquisition of the Wyant tract; (2) the acquisition of the Gerlach tract; (3) the unexercised option for the nearby Storey/Mangus tract; (4) the unexercised option for the nearby Grother tract; and (5) the speculative sale of the Boot Hill Casino property in Ford County. He also reviewed land sale activities in other gaming markets. Jortberg eventually dismissed the Boot Hill sale because it was a speculative sale without gaming approvals and was in a smaller market. Jortberg ultimately concluded the $17 million paid to acquire the subject property was the best evidence of its value. But because gaming revenues in 2013 were already 15% higher than projections, Jortberg applied a 15% adjustment of $2.6 million to the $17 million purchase price, making his total land value estimate $19.6 million.

Jortberg determined the reproduction cost for the subject property was $121 million based on actual costs reported in the 2013 Deloitte and Touche audit. He applied a 12.5% entrepreneurial incentive to the reproduction cost.

6

Jortberg found no evidence of incurable physical depreciation. He did, however, recognize $2.4 million in depreciation based on disposals associated with the conversion of the temporary casino back into the arena. In considering functional obsolescence, Jortberg wrote in his report:

> "[M]arket analysis indicates not only the ongoing construction of event center/entertainment areas at casinos by casino owners but also the demand illustrated for smaller footprint event centers to attract more numerous smaller shows as compared to the very large, publicly supported facilities which are too large for many potential shows."

Jortberg testified the property was not superadequate because (1) the facilities were built using best construction practices and (2) it was necessary to build the existing facilities as they were required by the management contract under KELA. He pointed out that Boyd Gaming purchased the property as part of its acquisition of Peninsula Gaming, Kansas Star's former parent company, and the audits reflected a value basis at cost or higher. Finally, Jortberg noted that during an actual market transaction involving the property, no impairment, obsolescence, or superadequacy was recognized. Jortberg similarly concluded there was no external obsolescence as evidenced by the business enterprise value far exceeding the real property value. After combining land value and replacement costs and then deducting depreciation, Jortberg arrived at a total valuation under the cost approach of $153.5 million.

Jortberg began his income allocation analysis by determining stabilized earnings before interest, tax, depreciation, and amortization (EBITDA), which he calculated based on his review of actual EBITDA for 2012 and 2013, a Wells Gaming research report, and metrics from the Colorado Gaming Commission. He then determined an appropriate EBITDA multiplier range, in this case 7.5 to 9.0, based on transactional data where EBITDA multipliers had been reported. By applying the EBITDA multipliers to EBITDA, Jortberg concluded the stabilized enterprise value was within the range of $563

7

to $675 million, which he rounded to a midpoint of $620 million. He then estimated the percentage of the total enterprise attributable to the real estate at 47% based on figures derived from publicly traded casinos. As the next step, Jortberg multiplied that figure by $620 million to derive an estimate for property, plant, and equipment of $291 million. He then subtracted $51.9 million for "Furniture, Equipment, & Other"—as reflected in the 2013 Deloitte and Touche audit—to reach a total valuation under the income approach of $239.5 million.

In completing his income approach, Jortberg performed an allocation analysis with the following caveat:

"In short, these intangible allocations of value can abusively and incredibly minimize the value of real property, ignoring fundamental principles of economics related to factors of production (land, labor and capital) which are elements of the creation of value. The premise that 'precisely' calculated intangible elements of value are superior metrics of valuation and are gold standards to calculate indirectly the impairment to the real property is fallacious. These methodologies (parsing, allocations, etc.) often ignore the fact that, were the real property not present, there would be no elements of intangible value. That said, intangible value allocations are relevant, and they should be considered on a case by case basis."

Under this approach, Jortberg found the value of the property would be $239.5 million. Jortberg then concluded: "This is clearly an incorrect conclusion because the value of the subject by the Cost Approach was $153.5 million." In his testimony, Jortberg noted that he did not "like any bit" of his allocation approach because there was not a typical marketplace extraction of factors of rates to do allocations. Jortberg explained that if he were evaluating a Hampton Inn—which would have many other similar properties—then it might be appropriate.

After reaching value conclusions under the cost approach ($153.5 million) and income allocation approach ($239.5 million), Jortberg concluded that his cost approach analysis was the best indicator of value because it was based on actual costs.

2.      *Kansas Star's appraisal expert*

David Lennhoff, MAI, testified on behalf of Kansas Star. Lennhoff is a nationally recognized expert in the area of separating real estate value from intangible value, and he has held positions and taught at the Appraisal Institute. Lennhoff considered but did not apply the sales comparison approach. Instead, Lennhoff performed a cost approach and a combined income/sales approach to value the property. Lennhoff's cost approach included a replacement cost analysis, land value analysis, and an obsolescence/depreciation analysis.

Lennhoff's land value conclusion was $2 million based on the sales values of five comparable properties. Lennhoff testified that he looked intentionally for comparable sales in an area that "might suggest something other than [agricultural land], but it might have the potential for something else." Lennhoff excluded from his analysis the effect of the market created by KELA because he did not believe it comported with the concept of an open and competitive market. Lennhoff's cost approach analysis considered the property as if the management contract were available but the buyer did not yet have it. None of the properties Lennhoff selected were in Sumner County and, therefore, could not be used for gaming purposes even if the management contract were available but not yet awarded.

Lennhoff also analyzed the Boot Hill Casino property sale—a speculative purchase of the land upon which the Boot Hill Casino was constructed—for a price of $10,391 per acre. Lennhoff concluded that the land value was $10,000 per acre, or a $1.35 million total land value for the 134 acres of nonagricultural land at the property.

Lennhoff acknowledged this was substantially higher than typical agricultural values at $3,000 per acre, but his conclusion was influenced by the values of potential commercial sites near Wichita and the $10,000 per acre speculative purchase of the Boot Hill Casino site.

To estimate replacement/reproduction costs, Lennhoff relied on cost estimates from Marshall Valuation Service as well as actual costs as reported by Kansas Star. The replacement and reproduction costs were almost identical: $352 per square foot for replacement costs compared to $356 per square foot for reproduction costs. Lennhoff used the replacement cost of $352 per square foot. Although Lennhoff determined the actual cost of the improvements was $116.6 million, he relied on Marshal Valuation Service's estimate of $94 million. He then added architectural and design fees of $6 million. Finally, Lennhoff applied an entrepreneurial incentive of $15 million, derived from multiplying $102 million (his combined total for land, improvements, and architecture and design fees) by 15%, which led to a total estimated value of $115 million. Lennhoff did not use the actual costs for construction because he felt they were influenced by the amount KELA required Kansas Star to spend. The total cost of the project submitted to the Lottery Commission was approximately $284 million (though the minimum investment requirement was only $225 million).

Lennhoff found no evidence of physical depreciation. He considered functional/external obsolescence by utilizing the market extraction method. He first compared the Kansas Star Casino to the 2005 sale of the Sports City indoor sporting arena in Blue Springs, Missouri, which he determined had depreciated 68% in value. He then compared Kansas Star's arena to the 2012 sale of the Pepsi Ice Midwest Arena in Overland Park, which had depreciated 37% in value. Based on these comparisons, Lennhoff concluded the subject property was approximately 40% depreciated, resulting in a reduction in value in excess of $46 million.

Lennhoff testified there were substantial market indications of functional obsolescence, noting that the property did not meet original expectations, was a loss leader, and was underutilized. Additionally, Lennhoff noted that his market extraction comparables were conservatively selected. He testified that the Kansas Coliseum sold for only its land value, which would indicate 100% obsolescence. Lennhoff found incompatibility between the arena and casino, which also reflects obsolescence. He noted that on the rare occasions that the arena was used to capacity, it lost money on its operations and discouraged gaming activity at the casino.

With respect to the casino, Lennhoff reviewed real estate-only sales of casinos in Atlantic City, which indicated an average depreciation of 93%. Lennhoff also evaluated the market to determine whether the casino was appropriately sized for its revenue-generating capabilities. Lennhoff compared the revenue per square foot of Kansas Star to the revenue per square foot of the five casinos in Kansas City in order to determine how much space was necessary to accommodate the gaming customer base. The revenue per square foot was substantially higher in Kansas City, with three of the five casinos having revenue per square foot of over $2,000, whereas Kansas Star's revenue per square foot was $1,170 just for the casino portion of the property. Lennhoff also noted that doubling the gaming space from 2012 to 2013 resulted in only a five percent revenue increase, strongly indicating that most of the additional space was unnecessary.

During cross-examination, Lennhoff admitted the Pepsi Ice Arena had been sold because the chiller failed and the owner could not afford to fix it. Also, Lennhoff agreed the fit and finish of the casino was what he would expect from a Midwestern, suburban Class A casino and that the actual improvements were unlikely to be turned into a basketball court or soccer field. Lennhoff explained that he had been unable to find ideal comparables for his market extraction analysis and that his 40% estimate was "[n]ot

11

perfect, but you've got to do something." After combining his land value and cost of improvements and then deducting depreciation, Lennhoff's total valuation under the cost approach was $71 million.

When performing the combined sales/income approach to estimate the value of the property, Lennhoff calculated the total value of the enterprise and then allocated a percentage of the value to the real property. Lennhoff's sales/income analysis began with Kansas Star's gross and net revenues from 2013, $207 million and $202 million, respectively. Lennhoff did not use actual EBITDA for the property because he was looking for market-typical figures to correspond with his market-typical allocation percentages. Lennhoff used three indicators to calculate a market-typical EBITDA margin: IBISWorld's Industry average profit margins for hotel-casinos (18.8%) and nonhotel casinos (22.6%) and a survey of average profit margins of large gaming companies (9.6% average). Lennhoff calculated a market EBITDA margin of 20%, near the highest end of his indicated range.

Lennhoff claimed he "did not want to incorporate the monopoly aspect to [his analysis] because that seems . . . to be potentially inconsistent with the definition of market value in Kansas." Lennhoff applied a profit margin of 20%, derived from his review of an IBISWorld publication and profit margins from casinos in competitive markets.

Next, Lennhoff multiplied his EBITDA estimate by a multiplier of 7.5—derived from his review of 10 casino sales—which led to a value of $304 million. During cross-examination, Lennhoff acknowledged it was less than half the enterprise value reflected in Kansas Star's actual balance sheets but asserted this was represented in an accounting and was due to the monopolistic nature of the property. After calculating enterprise value, Lennhoff applied an allocation percentage of 25%, based on (1) a casino study performed by William Kinnard in 1998; (2) allocation percentages from five motor speedways; and

12

(3) eight casino sales from 2009-2013. From this estimate, Lennhoff calculated the value of the real estate at $76.5 million, or $76.1 million for just the 134.5 acre parcel with improvements (and excluding the 63.5 acres that Kansas Star asserts is agricultural land).

Lennhoff reconciled his value under the cost approach ($71 million) and his value under the income allocation approach valuation ($76.5 million) and ultimately determined the fair market value for the property was $75.4 million.

Kansas Star also presented expert testimony from Cory Morowitz, a gaming consultant. Morowitz testified that because KELA required investors to spend a minimum of $225 million, bidders may have been required to build a project that was bigger than optimal. But based on the potential for an outsized return on investment in KELA's monopoly market, Morowitz testified: "I wouldn't say [bidders for the license] act irrationally, they promise things that they wouldn't build otherwise. So they will bid-up the offer, the ask in order to gain the license."

Morowitz went on to explain that in Kansas Star's case, because of the underserved market and outsized opportunity, a prudent buyer would likely promise to build more than necessary in order to secure the winning bid for the management contract. Morowitz also analyzed the number of arena seats to gaming positions at casinos and determined that the Kansas Star Arena had more seats per gaming position than the comparable casinos he reviewed. Morowitz explained that the prerecession trend to build more than what was needed had changed to the current trend, which is to "figure out what you need to support that local market and be as efficient as possible." Morowitz concluded that the size of the Kansas Star Arena was "inappropriate relative to its casino and hotel operations. Based on the ratio of seats to gaming positions, this suggests that as much as two-thirds of the arena seats may not be needed or are functionally obsolete."

13

Morowitz also evaluated the casino for functional obsolescence. Morowitz found that the temporary casino in the arena building was "satiating the market demand." But with the opening of the permanent casino/arena combination, which doubled the overall square footage and the casino floor space, Kansas Star saw only a five percent increase in revenue and a decline in EBITDA. Morowitz concluded: "So when I look at that, I say, they're not utilizing their assets correctly. They clearly have built too much, they[] could've built less, right, and got[ten] the same results."

D.    *BOTA's Decision*

BOTA determined the 63.5 acres leased to Hardison did not qualify as land devoted to agricultural use as of January 1, 2014. In reaching its conclusion, BOTA relied on Division of Property Valuation (DPV) Directive #99-038 and this court's decision in *In re Equalization Tax Appeal of Miami County Appraiser*, No. 106,659, 2012 WL 2149829 (Kan. App. 2012) (unpublished opinion), which state that activity from the prior tax year is to be considered when determining classification of the property. BOTA determined that merely signing a lease to farm was insufficient to establish agricultural activity.

In considering the parties' competing cost approach analyses, BOTA noted that in tax year 2013, it determined that because of purported deficiencies in both appraisers' methodologies, neither appraiser's cost approach was reliable or persuasive. BOTA rejected both of the experts' cost approach analyses, stating:

> "The Board finds that the challenges and deficiencies in accurately valuing the subject land value and estimating depreciation via the cost approach found by the Board in the prior tax year's appeal are similarly present at instant. The instant record is replete with evidence substantiating the Taxpayer's contention that the addition/opening of the casino had a lower than expected financial impact on the Taxpayer's business. Given these findings, the Board finds here, as in the prior tax year's appeal, that the income

14

approach methodology sponsored by appraisers Jortberg and Lennhoff is the best methodology for an accurate determination of the subject property's fair market value."

BOTA chose to calculate its own value using the income approach methodology used by both appraisers. The general formula used by both appraisers to derive fair market value under the income allocation approach was as follows:

1. (Actual revenue) x (estimated profit margin) = (estimate for EBITDA)

2. (EBITDA estimate) x (estimate for EBITDA multiplier) = (estimate for value of going concern)

3. (Estimate for value of going concern) x (estimate for real estate allocation percentage) = (estimate for fair market value).

BOTA began its income allocation approach analysis with Kansas Star's actual revenue for 2013. BOTA found that the median profit margin from a table in Jortberg's report was the best evidence of the profit margin. BOTA explained: "The Board finds that utilizing the subject property's reported actual 2013 revenue with a 21% profit margin as supported by the median drawn from publicly traded properties in the Jortberg appraisal yields an EBITDA of $42,600,000 (rounded)."

After estimating earnings before interest, tax, depreciation, and amortization (EBITDA), BOTA applied an EBITDA multiplier of 7.64 based on median data drawn from transactional data in both appraisals. Finally, BOTA applied a 30% real estate allocation percentage based on the median figure from a table in Lennhoff's report as the most appropriate reflection of market allocation. After applying this figure, BOTA concluded that the fair market value of the property for tax year 2014 was $97.6 million.

Kansas Star timely appealed; the County cross-appealed BOTA's rejection of the County's cost approach and BOTA's income allocation analysis.

*Standards of Review*

A taxpayer has the right to appeal an order of BOTA by filing a petition for judicial review with the Court of Appeals or the district court under K.S.A. 2017 Supp. 74-2426(c). Kansas Star filed a petition for judicial review with this court; the County filed a cross-petition for judicial review. We review BOTA's decision in the manner prescribed by K.S.A. 77-601 et seq., the Kansas Judicial Review Act (KJRA).

The KJRA defines the scope of judicial review of state agency actions unless the agency is specifically exempted from the application of the statute. K.S.A. 2017 Supp. 77-603(a); *Ryser v. Kansas Bd. of Healing Arts*, 295 Kan. 452, 458, 284 P.3d 337 (2012). BOTA orders are subject to KJRA review. K.S.A. 2017 Supp. 74-2426(c). While a county bears the burden of proof before BOTA, on appeal, the burden of proving the invalidity of BOTA's actions is on the party asserting the invalidity. K.S.A. 2017 Supp. 79-1609; K.S.A. 2017 Supp. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016). Further, when reviewing an agency action as set forth in K.S.A. 2017 Supp. 77-621(c), this court takes into account the rule of harmless error. K.S.A. 2017 Supp. 77-621(e); *Sierra Club v. Moser*, 298 Kan. 22, 47, 310 P.3d 360 (2013).

When construing tax statutes, the statutes must be construed strictly in favor of the taxpayer. *In re Tax Appeal of Harbour Brothers Constr. Co*., 256 Kan. 216, 223, 883 P.2d 1194 (1994); *In re Tax Protest of Jones*, 52 Kan. App. 2d 393, 396, 367 P.3d 306 (2016), *rev. denied* 305 Kan. 1252 (2017). Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). In making the unlimited review of a Kansas statute,

16

no deference is given to the agency's interpretation. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013); *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, Syl. ¶ 2, 228 P.3d 403 (2010). This ruling has been specifically applied to decisions of BOTA. See *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 472, 239 P.3d 96 (2010).

K.SA. 2017 Supp. 77-621(c) sets out eight standards under which a court shall grant relief. In this case, the parties are relying on K.S.A. 2017 Supp. 77-621(c)(4), (c)(7), and (c)(8) to support their arguments that relief should be granted.

K.S.A. 2017 Supp. 77-621(c)(4) requires a court to grant relief if the agency "erroneously interpreted or applied the law."

K.S.A. 2017 Supp. 77-621(c)(7) requires a court to grant relief if "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2017 Supp. 77-621(d) defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. A reviewing court must determine whether the evidence supporting an agency's factual findings is substantial when considered in light of all the evidence but does not reweigh evidence or engage in de novo review. K.S.A. 2017 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84, 239 P.3d 66 (2010). "Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined." *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009).

Finally, K.S.A. 2017 Supp. 77-621(c)(8) requires a court to grant relief if BOTA's "action is otherwise unreasonable, arbitrary or capricious." "Because a rebuttable presumption of validity attaches to all administrative agency actions, the burden of

17

proving arbitrary and capricious conduct lies with the party challenging the agency's actions." *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 333, 102 P.3d 1176 (2004), *rev. denied* 279 Kan. 1006 (2005).

The test for finding arbitrary and capricious conduct is determining "'whether [a] particular action should have been taken or is justified,'" such as the reasonableness of an agency's exercise of discretion in reaching a determination or whether the agency's action was without foundation in fact. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010); *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). "Flipping a coin, for example, would be incompatible with weighing of evidence or drawing conclusions necessary to support [the] decision. That would be true without regard to the soundness of the outcome, and a court would act within its authority to vacate the result as arbitrary." *Rural Water Dist. #2 v. Miami County Board of Comm'rs*, No. 105,632, 2012 WL 309165, at *10 (Kan. App. 2012) (unpublished opinion). An order is arbitrary and capricious if it is unreasonable or without foundation in fact. *Citizens Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 47 Kan. App. 2d 1112, 1124, 284 P.3d 348 (2012).

> "A challenge under K.S.A. 2010 Supp. 77-621(c)(8) attacks the quality of the agency's reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010) (stating that agency may have acted arbitrarily when it fails to properly consider factors courts require it to consider to guide its discretionary decision); *Wheatland Electric Cooperative*, 46 Kan. App. 2d 746, Syl. ¶ 5 (providing factors to consider when determining whether agency acted within its discretion); Gellhorn & Levin, Administrative Law and Process in a Nutshell, p. 103 (5th ed. 2006) ('[T]he emphasis in arbitrariness review [is on] the *quality of an agency's reasoning.*')." *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1115, 269 P.3d 876 (2012).

When determining the validity of an assessment of the valuation of real property for uniformity and equality in the distribution of taxation burdens, the essential question

is whether the standards prescribed in K.S.A. 2017 Supp. 79-503a have been considered and applied by taxing officials. *Krueger v. Board of Woodson County Comm'rs*, 31 Kan. App. 2d 698, 702-03, 71 P.3d 1167 (2003), *aff'd* 277 Kan. 486, 85 P.3d 686 (2004).

*General concepts of ad valorem taxation*

All real and tangible personal property in Kansas is subject to taxation on a uniform and equal basis unless specifically exempted. Kan. Const. art. 11, § 1(a); K.S.A. 79-101. The Kansas Legislature has enacted a statutory scheme to ensure property is appraised for ad valorem tax purposes in a uniform and equal manner. Central to this statutory scheme is the requirement that property be appraised at fair market value as of January 1 of each taxable year, unless otherwise specified by law. K.S.A. 79-1455.

When determining ad valorem valuation, Kansas law requires valuation of the fee simple interest, which is defined as

> "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008). Stated another way, '[o]wnership of the fee simple interest is equivalent to ownership of the complete bundle of sticks [property rights] that can be privately owned.' The Appraisal of Real Estate, p. 112. . . .
>
> "Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property* in an *open and competitive market*,

19

assuming that the parties are acting without undue compulsion.' (Emphasis added.) It is clear, therefore, that the fair market value statute values *property* rights, not *contract* rights." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130-31, 275 P.3d 56 (2012).

The concept that Kansas law requires valuation of the fee simple interest is consistent with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires that all rights and privileges in real property are to be valued. However, "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

In determining the ad valorem valuation, Kansas law assumes a hypothetical sale as of January 1 of the applicable tax year. K.S.A. 2017 Supp. 79-503a. The hypothetical sale must include only the sticks in the bundle of rights and may not include intangible interests or enterprise value. See K.S.A. 79-102; *In re Tax Protest of Strayer*, 239 Kan. 136, 142-43, 716 P.2d 588 (1986) (intangible property interests not taxable for property tax purposes).

K.S.A. 79-1455 states: "Each year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." As such, the Kansas statutory scheme "is a surrogate for a real marketplace event; the statute requires the appraiser to pretend, in effect, that each piece of property is sold on January 1 of the year in which the appraisal is done in an arms length transaction." *Hixon v. Lario Enterprises, Inc.*, 19 Kan. App. 2d 643, 646-47, 875 P.2d 297 (1994), *aff'd as modified* 257 Kan. 377, 892 P.2d 507 (1995). This pretend transaction is often referred to as a hypothetical sale of the subject property.

20

Key to determining a value for this hypothetical sale is fair market value. K.S.A. 2017 Supp. 79-503a defines fair market value and provides guidance on the factors used to determine fair market value.

"'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

21

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

This list of factors is nonexclusive.

Appraisals for ad valorem taxation purposes must be performed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP). K.S.A. 79-506(a). In addition, the ad valorem appraisal process must "conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 2017 Supp. 79-503a.

### DID BOTA ERR IN CLASSIFYING 63.5 ACRES AS REAL ESTATE USED FOR COMMERCIAL AND INDUSTRIAL PURPOSES?

Kansas Star first argues that BOTA erred as a matter of law when it classified 63.5 acres of the property as real estate used for commercial and industrial purposes when the land was subject to a farming lease. Kansas Star complains that (1) BOTA improperly placed the burden of proof on Kansas Star and (2) BOTA improperly weighed the evidence. As resolving this question involves statutory interpretation, which is a question of law, our review is unlimited. *Unruh*, 289 Kan. at 1193.

Under K.S.A. 2017 Supp. 79-1439(b), taxing authorities are required to classify real property as one of seven classes and then assess taxes at a percentage specified by

the statute. The County classified the entire 195.5 parcel as commercial and industrial for tax year 2014.

On appeal to BOTA, Kansas Star argued that because it had leased approximately 63.5 acres to a farmer before the date of valuation, the leased acreage should have been classified as agricultural. BOTA rejected this argument and ruled that the acreage was properly classified as land for commercial and industrial use. BOTA based its decision on the fact that even though the acreage was under a lease for farming, the leased ground had not been planted with any crop as of the date of valuation and had not been used agriculturally in the prior year.

This dispute is significant because Kansas taxes agricultural land at a lower rate than land classified as commercial and industrial. Under the Kansas Constitution, "[l]and devoted to agricultural use" is valued based on income production rather than the price a willing buyer would pay a willing seller (fair market value). Kan. Const. art. 11, § 1(a). However, the Kansas Constitution gave the Legislature the power to define what constitutes land that is devoted to agricultural use. Kan. Const. art. 11, § 12. The Legislature has defined agricultural land as land "devoted to the production of plants, animals or horticultural products." K.S.A. 2017 Supp. 79-1476.

Real property is classified according to its use on January 1 of each year. For property such as land devoted to agricultural use which has seasonal uses, the classification should be based annually upon the overall use during the prior year or operating period. See K.S.A. 2014 Supp. 79-1476; DPV Directive #99-038.

A.    *Burden of proof*

Kansas Star argues that BOTA improperly found that it bore the burden of proof to show that the property should not be classified as commercial property.

23

K.S.A. 2017 Supp. 79-1609 states:

> "With regard to any matter properly submitted to the board relating to the determination of valuation of residential property or real property used for commercial and industrial purposes for taxation purposes, it shall be the duty of the county appraiser to initiate the production of evidence to demonstrate, by a preponderance of the evidence, the validity and correctness of such determination."

The County bore the burden of proof to show that the land was classified as commercial property. In *In re Equalization Appeal of Camp Timberlake*, No. 111,273, 2015 WL 249846 (Kan. App. 2015) (unpublished opinion), the taxpayer argued that Johnson County erroneously classified his property as commercial instead of agricultural. On appeal, the *Camp Timberlake* panel held that the County had the initial statutory burden to prove the valuation of the property as commercial property, but the party asserting a different classification must come forward with evidence supporting that position. 2015 WL 249846, at *6-8. The panel also distinguished between the burden of proof of the classification of the property and the burden of production of affirmatively arguing for a different classification.

> "'The burden of proof is not to be confused with the burden of going forward with the evidence. The burden of proof is always on the party asserting an affirmative of an issue and remains with him throughout the trial. Even though it may be incumbent upon the other party to proceed with the introduction of evidence at some stage of the proceedings, the burden of going forward with the evidence does not change the burden of proving a disputed issue.' [*Jenson*,] 205 Kan. at 467." *Camp Timberlake*, 2015 WL 249846, at *8.

Here, the County introduced evidence that the property had been used as a commercial gaming enterprise since December 2011. As to whether a portion of the property should now be classified as agricultural, the burden was on Kansas Star to produce evidence that a portion of the property had been put to agricultural use.

B.      *Evidence of agricultural classification*

The Legislature has defined agricultural land as land "devoted to the production of plants, animals or horticultural products." K.S.A. 2017 Supp. 79-1476. In interpreting the Legislature's use of the word "production," this court has concluded that the term "certainly suggest[s] that some activity must take place. The constitutional provision speaks of land *devoted* to agricultural use, and the statute speaks of land devoted to the *production* of agricultural goods." *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1115-16, 269 P.3d 876 (2012); see Kan. Const. art. 11, § 1(a); *In re Miami County Appraiser*, 2012 WL 2149829, at *1.

Kansas Star identifies only two pieces of evidence to support its claim. First, it points to the farm lease between Kansas Star and Hardison executed on December 20, 2013, approximately 13 days before the relevant date of valuation. But, as this court has recognized on a number of occasions, "it's not enough just to enter into a lease for someone to farm the property because '[t]he mere existence of a lease allowing production does not demonstrate that any production actually took place.' [*Oakhill Land Co.*,] 46 Kan. App. 2d at 1116." *In re Miami County Appraiser*, 2012 WL 2149829, at *1. Kansas Star must show more than the mere existence of a farm lease.

Next, Kansas Star notes that Ihm testified that Hardison raised soy beans on the property in 2014 and 2015. But as correctly noted by BOTA, under DPV Directive #99-038, the decision to classify a property as agricultural is based on the use of the property during the prior year or operating period. See *In re Miami County Appraiser*, 2012 WL

25

2149829, at *2 ("Certainly tax valuations for [January 1 of a taxable year] couldn't be based on what happens in fall [of that same year]; the appraiser must send out the classification and valuation notice each year by March 1."). Accordingly, Ihm's testimony does not establish that either Kansas Star or Hardison performed agricultural activities on the property in the year or operating period prior to January 1, 2014.

Kansas Star also points to Jortberg's testimony in support of its position. Jortberg testified that the property was being used for "interim agricultural use" but it had potential for future commercial development. However, Jortberg did not testify that it was being used for agricultural use on the date of valuation, and he testified that he did not recall whether soy beans had been planted or if there was hay growing on the property as of his visit in January 2014.

Given that Kansas Star failed to present evidence from which BOTA could have properly concluded that the leased acreage was devoted to agricultural use as of January 1, 2014, BOTA's decision was legally correct and supported by substantial competent evidence.

C.    *Evidence of commercial use*

Alternatively, Kansas Star argues the County failed to show that the leased acreage was being used for commercial purposes on the valuation date of January 1, 2014. The County, while not disputing that it bore the burden of proving the classification of the property, counters that Kansas Star grossly misstated the requirements imposed on the County to meet this burden.

The County notes that on May 15, 2013, the DPV issued a memorandum to all Kansas county appraisers, titled "Classification of Non-Productive Land within a Single Agricultural Operation," which addressed the issue of proper classification for

26

nonproductive areas of a tract predominantly used for agriculture. In the memorandum, the Division of Property Valuation noted: "The non-use of a portion of a commercial building does not lead to a mixed use classification, even though the non-used area can be clearly identified. Rather the classification is based on the devoted and primary use of the property." DPV Directive #99-038 provides: "Real property with varying uses may be assigned more than one classification. If the uses are so intermingled as to defy classifying identifiable, physical portions of the property, then the property should be classified based upon its predominate use." Kansas Star argues the property is not so intermingled that it cannot be separated, but it presented no evidence that the 63.5 acres was devoted to agricultural use during the prior year.

Here, the County presented evidence of a casino operating on the subject property of 195.5 acres, which was valued as a whole. There is no dispute that the subject property's primary use is commercial gaming. At the time Kansas Star acquired the total site, it intended to use the Wyant tract for future development, such as an RV park, a maintenance building, livestock feed and supply improvements, or other types of future development. Instead, in December 2013, Kansas Star leased the land to Hardison for farming.

While the 63.5 acres leased to Hardison may not have been actively used for commercial purposes as of January 1, 2014, there was no evidence that it was used otherwise. The County is not required to assign separate property classifications to nonproductive portions of a property primarily used for commercial purposes. The County presented sufficient evidence of the property's primary use, and BOTA's decision to uphold the County's property classification was supported by substantial competent evidence.

27

Kansas Star argues that BOTA erred in rejecting Lennhoff's cost approach for two reasons: (1) BOTA mistakenly found that Lennhoff relied on the same material facts in his 2013 appraisal as he did in his 2014 appraisal, and (2) Lennhoff's cost approach was more credible and should not have been rejected.

A.     *A comparison of Lennhoff's 2013 appraisal to his 2014 appraisal*

Lennhoff appraised the property at a value of $71 million based on his market extraction analysis. He opined that Kansas Star's casino and arena were 40% depreciated, resulting in a value reduction in excess of $46 million.

The market extraction method of estimating depreciation "relies on the availability of comparable sales from which depreciation can be extracted. It makes use of direct comparisons with sales of comparable properties." The Appraisal of Real Estate, Appraisal Institute, 605 (14th ed. 2013). However, "the market extraction method should only be used if sufficient data exists and if the quality of that data is adequate to permit meaningful analysis." The Appraisal of Real Estate, Appraisal Institute, 605 (14th ed. 2013).

For tax year 2013, Lennhoff measured depreciation by comparing Kansas Star's casino and arena to (1) the 2001 sale of the back-of-house portion of the Sam's Town Casino in Kansas City, Missouri (later converted to a corporate training facility) and (2) the 2012 sale of an ice arena in Overland Park with a broken chiller system (later converted to a basketball and soccer facility). BOTA found this analysis to be unreliable.

In tax year 2014, Lennhoff again attempted to apply the market extraction method but this time compared the casino and arena to (1) the 2005 sale of an indoor sports arena

28

in Blue Springs, Missouri, and (2) the same sale of the ice arena with the broken chiller system. BOTA again rejected this analysis, stating: "The Board finds that the challenges and deficiencies in accurately valuing the subject land value and estimating depreciation via the cost approach found by the Board in the prior tax year's appeal are similarly present at instant."

Kansas Star claims the facts that Lennhoff relied on in 2014 were materially different from the facts he relied on in 2013, meaning BOTA's decision to reject the 2014 appraisal for the same reasons it rejected the 2013 appraisal was arbitrary and unreasonable. This is an incorrect characterization of BOTA's ruling. When BOTA referenced Lennhoff's 2013 methodology as justification for again rejecting his analysis in 2014, it merely found that Lennhoff's comparable sales were unreliable and unpersuasive, as it found in 2013. In fact, Lennhoff acknowledged the shortcomings in his comparables. When read in context, it is evident that BOTA very much understood the weaknesses in Lennhoff's comparables and simply repeated the same concerns about the lack of reliable comparables as it had in 2013.

B.      *Rejection of Lennhoff's cost approach*

Kansas Star next argues that BOTA erred in rejecting Lennhoff's cost approach because it failed to give proper weight to evidence from expert Morowitz, as well Boyd Gaming employees Ihm and Runde. Kansas Star claims the evidence corroborated Lennhoff's conclusion that the subject property suffered from functional obsolescence. The County maintains that Kansas Star's argument is merely another request for us to reweigh the evidence or engage in de novo review, which we cannot do. See K.S.A. 2017 Supp. 77-621(d). BOTA's decision to reject Lennhoff's cost approach was supported by substantial competent evidence.

29

The County further argues that the notion that superadequacy can adequately be identified by simply evaluating the arena's contribution to overall profitability improperly disregards KELA's effect on fair market value. See K.S.A. 2017 Supp. 79-503a(j) (restrictions or requirements imposed on the use of the real estate by government bodies are factors to consider in determining fair market value). Kansas Star compares its arena to a swimming pool in an apartment complex that costs $5,000 per year to operate but generates no additional revenue. The County notes the flaw with this analogy, pointing out that an apartment complex is not legally required to have a pool, but the removal of the arena at the casino would result in Kansas Star being in noncompliance with KELA and the management contract, placing its gaming license at risk.

Kansas Star argues that it could have adequately served the same gaming market with a smaller facility and no arena, but, through KELA, the Legislature imposed a $225 million minimum investment requirement and further required each of the four casinos to be at a specified destination location. See K.S.A. 2017 Supp. 74-8734(d). KELA required the Lottery Commission to consider (1) the size of the proposed facility; (2) its location as a tourist and entertainment destination; and (3) agreements related to ancillary facilities as part of the approval process. See K.S.A. 2017 Supp. 74-8734(e). Kansas Star voluntarily included an arena in its bid and, by doing so, became contractually obliged to build and operate the arena.

Functional obsolescence can take two forms: functional inadequacy and functional superadequacy. Functional inadequacy is a deficiency in the structure, materials, or design of an improvement, such as too few bathrooms in a residence or low warehouse ceiling heights. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013). Functional superadequacy is "some aspect of the subject property [that] exceeds market norms" or special features built to the owner's specifications that "would not appeal to the market in general," such as an expensive in-ground swimming pool in a

30

low-cost neighborhood or a warehouse building with excess office space. The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013).

Kansas Star argues that the evidence in the record supports its superadequacy position because the arena has been unprofitable and its overall gaming enterprise made more money in the temporary casino. Kansas Star points to testimony and evidence that the arena is not profitable and decreases the value of the overall subject property. Additional evidence was presented that the arena was oversized relative to the market. But there is also evidence showing that Kansas Star does not operate its gaming enterprise in the same marketplace as casinos that do not have the protections from competition or the building and operation requirements imposed by KELA. Under KELA, Kansas Star was required to build and maintain the casino and arena which it included in its bid that won the license. And in this market, (1) Kansas Star exceeded its revenue projection for 2014 by the end of 2013 by approximately 16.3%; and (2) Kansas Star's actual profit margin was 37.6%, which exceeded the average profit margin for the companies Jortberg reviewed by 14.5% and the average profit margin for the companies Lennhoff reviewed by 18.8%.

The County maintains that in the actual market in which any hypothetical sale of the subject property would take place, a hypothetical buyer would agree to pay, at a minimum, the cost to construct the arena and casino as built because those facilities are integral to any operator's ability to legally conduct a monopoly gaming enterprise on the property. The County's position is confirmed by the real world sale of the property—Boyd Gaming purchased the property as part of its acquisition of Peninsula Gaming—without any recognized reduction in value for either the arena or the casino. BOTA did not err by rejecting Kansas Star's claim that the value of the property had depreciated by 40% as the evidence in the record supports BOTA's conclusion.

Both Kansas Star and the County agree that BOTA's income allocation analysis in tax year 2014 is unsupported by substantial competent evidence. For this reason, the parties assert that BOTA's decision is unreasonable, arbitrary, and capricious.

A.    *Did BOTA err in rejecting Jortberg's cost approach?*

The County argues that BOTA's decision to reject Jortberg's depreciation analysis is faulty in a number of respects. First, it points to the fact that BOTA's rejection of Jortberg's depreciation analysis in 2013 was overturned by the district court on appeal, theorizing that BOTA's similar rejection of Jortberg's depreciation analysis for 2014 must be faulty as well. For tax year 2013, the district court adopted Jortberg's depreciation analysis, holding:

> "On this critical issue of functional obsolescence, or super adequacy as framed by the taxpayer, the court is persuaded that the county's evidence and argument is superior to that of the taxpayer. As the county states, the casino is new construction designed and built by experienced gaming facility operators. There should be no functional obsolescence. As to the claim of super adequacy, the taxpayer fails to account for the fact that this is property licensed for operation of a monopoly casino under [KELA]. The casino had to be of a certain size in order for the taxpayer to be awarded the management contract. The arena was part of the total package presented to the state in order for Kansas Star to be awarded the management contract. Any purchaser buying the land for purposes of operating a casino under a KELA management contract would have to buy or construct similarly 'super adequate' facilities in order to qualify for the management contract. Finally, as the county notes, when the property in question was purchased by Boyd Gaming there was no indication that any discount was given for any 'external factor . . . identified as a source of value loss.'"

We addressed this issue in the companion case 115,587 and found, limited by our standard of review there, that the district court's conclusion that the property did not suffer from functional obsolescence was supported by substantial competent evidence. However, our decision to affirm the district court on the issue of functional obsolescence does not constitute an endorsement. It simply means there was enough evidence in the record to support the district court's finding. The fact-finder is the principal decider in these instances, which means that our conclusion from the tax year 2013 appeal need not be consistent with this 2014 appeal as the fact-finders are different and our standard of review is deferential. See generally *In re Tax Appeal of Fleet*, 293 Kan. 768, 780-81, 272 P.3d 583 (2012) (collateral estoppel inapplicable for different tax years). Our role is not to make a de novo determination as to the existence of functional obsolescence. In the 2014 tax year valuation, BOTA reached the opposite conclusion of the district court for the 2013 tax year and rejected Jortberg's finding of no functional obsolescence. Our review is limited to evaluating whether BOTA's decision is supported by substantial competent evidence.

BOTA rejected both appraisers' depreciation analyses based in part on its prior analysis of depreciation in tax year 2013. In 2013, BOTA provided the following explanation for rejecting Jortberg's analysis:

> "The Board is not persuaded by either parties' treatment of obsolescence/depreciation under the cost approach. Jortberg failed to analyze any potential superadequacy of construction even though superadequacy was a potential issue given the KELA minimum investment requirement. Instead, Jortberg simply states that 'the appraiser notes no functional obsolescence.' County Exhibit #522, p. 54. Jortberg stated in his report that no economic obsolescence existed because the business enterprise value far exceeds the value of the real property. Jortberg performed no recognized appraisal analysis to determine whether functional or economic obsolescence existed."

In 2014, BOTA summarily explained:

33

"The Board finds that the challenges and deficiencies in accurately valuing the subject land value and estimating depreciation via the cost approach found by the Board in the prior tax year's appeal are similarly present at instant. The instant record is replete with evidence substantiating the Taxpayer's contention that the addition/opening of the casino had a lower than expected financial impact on the Taxpayer's business."

BOTA appears to reject Jortberg's cost approach analysis in part because of his alleged failure to consider superadequacy. Superadequacy is some aspect of the property that exceeds market norms, such as "special features . . . that would not appeal to the market in general." The Appraisal of Real Estate, Appraisal Institute, 623 (14th ed. 2013.) But the record shows that Jortberg considered superadequacy. In his 2014 appraisal report, Jortberg explained that he considered and rejected any functional obsolescence:

"Functional obsolescence may be caused by such items as inadequacy or super adequacy in size, style, mechanical equipment or other physical elements of the property. The appraiser notes no functional obsolescence at the subject property. The facility is new structure which incorporates best construction practices. The market analysis indicates not only the ongoing construction of event centers/entertainment arenas at casinos by casino owners but also the demand illustrated for smaller footprint event centers to attract more numerous smaller shows as compared to the very large, [publicly] supported facilities which are too large for many potential shows."

Jortberg testified that the property was not superadequate because the facilities were built using best construction practices and it was necessary to build the facilities that were ultimately built in order to obtain the management contract under KELA. Moreover, Jortberg noted that during an actual market transaction involving the property, no impairment, obsolescence, or superadequacy was recognized. BOTA's ruling is not entirely clear, but it would be error for BOTA to base its decision to reject Jortberg's approach based on his alleged failure to consider superadequacy.

34

This notwithstanding, a fair reading of BOTA's opinion suggests that it likely rejected Jortberg's analysis based on its disagreement with his conclusion of no functional obsolescence. By referencing the "lower than expected financial impact" of the arena, BOTA appears to have concluded that there must be some functional/economic obsolescence because a hypothetical buyer would not purchase an arena that does not generate revenue sufficient to justify its cost of construction. The County complains that this conclusion is fundamentally flawed because the arena was projected from the beginning to operate at a loss. The County directs us to the materials submitted by Kansas Star during the bid process projecting that the arena would sustain operating losses ranging from $790,170 in 2013 to $534,046 in 2016. We note, however, that Kansas Star cites evidence in the record disputing this expectation and in support of its expectation that the arena would increase revenue.

A valid depreciation/obsolescence analysis "should reflect how an informed and prudent buyer would react to the condition and quality of the property and the market in which the property is found." The Appraisal of Real Estate, Appraisal Institute, 597 (14th ed. 2013). Here, the County notes there is a genuine dispute that the market for the subject property is controlled by KELA. Because of this factor, the County asserts that BOTA erred in assuming that a hypothetical buyer would not pay for facilities such as the arena because it did not independently operate at a profit. The County argues that in a hypothetical sale, no discount for the arena would be recognized because the arena is a legal requirement for either the buyer or seller to operate a gaming enterprise in the market. The County asserts that BOTA's rejection of its cost approach analysis disregards KELA's effect on the marketplace and is arbitrary and capricious.

The County's argument, in effect, asks us to reweigh the evidence and make our own determination of the propriety of functional obsolescence. "We . . . do not reweigh competing evidence or assess credibility of witnesses. The Board's findings will be upheld . . . even though other evidence in the record would have supported contrary

35

findings." *Graham v. Dokter Trucking Group*, 284 Kan. 547, 553-54, 161 P.3d 695 (2007). While we acknowledge the highly conflicted nature of the evidence in this case, there is evidence supporting BOTA's decision to reject Jortberg's analysis based on his conclusion that the property suffers from no functional obsolescence. Numerous witnesses testified as to the depreciation of the arena and the lower than expected revenues from the project. Because there is evidence in the record to support either conclusion, we cannot find error in BOTA's conclusion.

The County also fails to persuade us that BOTA's decision to reject Jortberg's opinion was arbitrary and capricious. The test for arbitrary and capricious conduct is determining whether a particular action should have been taken or justified, such as the reasonableness of an agency's exercise of discretion in reaching a determination or whether the agency's action is without foundation in fact. *Powell*, 290 Kan. at 569. Here, there is no showing that BOTA's decision was not supported by the evidence or that it took a particular action without a basis in the record.

B.      *Is BOTA's income allocation approach supported by substantial competent evidence?*

Both parties agree that BOTA's income approach erroneously applied K.S.A. 2013 Supp. 79-503a and K.S.A. 2013 Supp. 79-505 when it did not rely on evidence in the appraisals but merely split the difference and applied a median value with no evidence to support its ruling. Specifically, the County asserts that the income allocation approach adopted by BOTA is not supported by substantial competent evidence and is otherwise unreasonable, arbitrary, and capricious. The County complains that BOTA's decision merely "applies figures that back into . . . a resulting mid-range value." This makes our review difficult because BOTA does not have counsel pointing to evidence in the record in support of its findings. Accordingly, we are required to scour the record to determine whether BOTA's income approach is supported by substantial competent evidence.

36

Both Lennhoff and Jortberg used the income allocation approach in their appraisals, but BOTA did not adopt the approach used by either appraiser. Instead, BOTA established its own input values to reach its final value conclusion of $97.6 million. BOTA explained its decision as follows:

"The Board finds that utilizing the subject property's reported actual 2013 revenue with a 21% profit margin as supported by the median drawn from publicly traded properties in the Jortberg appraisal yields an EBITDA of $42,600,000 (rounded). The Board further finds that an EBIDTA multiplier of 7.64 is appropriate based on median data drawn from transactional data in both appraisals. Upon review of the allocation analysis presented by [Lennhoff], the Board finds that the median of 30% is the most appropriate reflection of market allocation. Application of these income approach inputs results in a value of $97,600,000, rounded, for the subject real property."

Both parties complain that BOTA applied median figures across the board to achieve its value conclusion. Our research has failed to uncover a case employing a similar approach. Generally, when this court has upheld an adjustment to a value that was made by BOTA, it has looked for substantial competent evidence in the record supporting such an adjustment. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 888-89, 214 P.3d 707 (2009) (upholding BOTA's adjustment for freezer space/cooler space that was not accounted for in the appraisal). Here, BOTA did not point to substantial evidence in the record supporting its figures; rather, it admitted that it adjusted the values from the two appraisers to show median values. This appears to be BOTA's version of splitting the baby.

For its first instance of improper splitting of the difference, the County points to BOTA's 21% profit margin figure as unsupported by substantial competent evidence in the record. As has been discussed, the parties disagree as to how Kansas Star's monopoly status should be accounted for in determining fair market value. Jortberg applied a 37.5% profit margin, based on Kansas Star's actual profit margins in 2012 and 2013 (48% and

37

37.6%, respectively), a review of earnings before interest, tax, depreciation, and amortization (EBITDA) margins for a number of Colorado casinos, a study by Dean Macomber, and EBITDA margins from publicly traded companies. In contrast, Lennhoff ignored Kansas Star's actual profit margin because it occurred in a monopoly market; he instead relied on a 20% margin based on an IBISWorld publication and his review of profit margins from casinos in competitive markets.

BOTA began its income allocation approach analysis with Kansas Star's actual revenue for 2013. BOTA found that the median profit margin from a table in Jortberg's report was the best evidence of the profit margin in this case. BOTA explained: "The Board finds that utilizing the subject property's reported actual 2013 revenue with a 21% profit margin as supported by the median drawn from publicly traded properties in the Jortberg appraisal yields an EBITDA of $42,600,000 (rounded)."

After estimating EBITDA, BOTA applied an EBITDA multiplier of 7.64 based on median data drawn from transactional data in both appraisals. Finally, BOTA applied a 30% real estate allocation percentage based on the median figure from a table in Lennhoff's report as the most appropriate reflection of market allocation. After applying this figure, BOTA concluded that the fair market value of the subject property for tax year 2014 was $97.6 million.

The County complains that BOTA's decision to take the median drawn from publicly traded properties in the Jortberg appraisal results in a reduction of fair market value in excess of $76 million. BOTA chose a 21% profit margin when Kansas Star had an actual profit margin of $37.6%. The County further points to the fact that even if BOTA could justify using the median figure from Jortberg's report, the actual median figure was 21.9%, not 21%, resulting in a difference of valuation of $4.2 million.

38

The County also points out that this analysis ignores the fact that the property operates in a monopoly market under KELA. As such, any hypothetical sale would occur under this condition, and BOTA is required to consider KELA's effect on the value of the property. See K.S.A. 2017 Supp. 79-503a (identifying components of fair market value that must be considered, including restrictions imposed on the use of the real estate).

Finally, the County complains that BOTA settled for its own income allocation approach and arbitrarily chose a median profit margin from Jortberg's appraisal report as the best number to use. BOTA does not explain how this median number better represents the profit margin that specifically applies to Kansas Star. The County acknowledges that BOTA is not required to render the explanation for its findings in detail, but the explanation must be "specific enough to allow judicial review of the reasonableness of the order." *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988). We must "review the agency's explanation as to why the evidence supports its findings." *Rhodenbaugh v. Kansas Employment Sec. Bd. of Review*, 52 Kan. App. 2d 621, 631, 372 P.3d 1252 (2016). However, "we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 195 [1947]).

The essence of the County's argument is that BOTA seems to have selected figures out of thin air and has provided no explanation for its 21% profit margin. We must agree. BOTA provides little to no explanation for this figure, making it impossible for us to determine whether the figure is supported by substantial competent evidence. Accordingly, BOTA's adoption of a compromise profit margin of 21% is arbitrary and capricious.

C.      *Is BOTA's 7.64 EBITDA multiplier supported by substantial competent evidence?*

The County also disputes BOTA's decision to apply a 7.64 EBITDA multiplier as part of its income analysis. In considering the appropriate multiplier, Lennhoff advocated for an EBITDA multiplier of 7.5, while Jortberg estimated the multiplier to be between 7.9 and 9.5. Again, BOTA selected neither option and applied an EBITDA multiplier of 7.64, summarily explaining: "The Board . . . finds that an EBITDA multiplier of 7.64 is appropriate based on median data drawn from transactional data in both appraisals."

The County claims that neither party has been able to replicate BOTA's calculation. Each party's expert analyzed 10 transactions as part of his analysis. Of the 10 Lennhoff reviewed, the average EBITDA multiplier was 7.82 and the median was 7.68. Of the 10 Jortberg reviewed, the average was 8.1, while the median (which Jortberg did not calculate) would have been 7.5. The combined list of data from both experts includes three duplicates. Accounting for each duplicate only once, the median EBITDA multiplier of the combined 17 transactions is 7.68, not 7.64. Because neither party can ascertain how BOTA derived its 7.64 EBITDA multiplier, the County argues that BOTA's conclusion cannot be supported by substantial competent evidence. We agree.

Even assuming BOTA had calculated the median EBITDA multiplier correctly, BOTA did not explain why the median figure was the proper figure to apply. USPAP Standard 1-1(a) requires appraisers to "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal." Had either appraiser suggested that the applicable EBITDA multiplier could be determined by selecting the median figure from a list of 17 transactions, that methodology might have been challenged as a violation of USPAP. "[USPAP] standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to

40

them may constitute a deviation from a prescribed procedure or an error of law." *Dillon Stores*, 42 Kan. App. 2d at 890. BOTA cannot apply a methodology the appraisers themselves could not.

The record contains no evidence that (a) the Ameristar Casino—the only transaction with a 7.64 EBITDA multiplier—is comparable to Kansas Star; (b) selecting the median EBITDA multiplier from a list of 17 transactions is a statistically significant or persuasive methodology for selecting an EBITDA multiplier; or (c) the median EBITDA multiplier from the parties' combined transactional data is otherwise persuasive evidence in light of the record as a whole. BOTA's decision to apply a 7.64 EBITDA multiplier is unsupported by substantial competent evidence and is arbitrary and capricious.

D.      *Is BOTA's 30% real estate allocation percentage supported by substantial competent evidence?*

Finally, the County argues that BOTA applied a 30% real estate allocation percentage—based on the median figure in a chart in Lennhoff's appraisal—that had no support in the record. The record presented contains no evidence that selecting the median figure from a list of eight transactions (1) comports with USPAP; (2) is a statistically significant or appropriate methodology for determining real estate allocation percentage; or (3) is otherwise persuasive evidence in light of the record as a whole. BOTA's decision to apply a 30% real estate allocation percentage is not supported by substantial evidence and is unreasonable, arbitrary, and capricious.

In conclusion, and for the reasons set forth above, BOTA's decision to adopt its own income allocation approach analysis is unsupported by the record, is arbitrary and capricious, and must be reversed.

Affirmed in part, reversed in part, and remanded with directions for BOTA to apply an approach to value that is supported by substantial competent evidence in the record.